In the Disciplinary Matter Involving
John M. RICE, Attorney.

No. S–13856.

Supreme Court of Alaska.

Aug. 26, 2011.

⚷59.5(2)

Fred W. Triem, Petersburg, for John M. Rice.

Mark Woelber, Assistant Bar Counsel, and Stephen Van Goor, Bar Counsel, Anchorage, for Alaska Bar Association.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Upon receiving notice that an attorney had overdrawn his client trust account, the Alaska Bar Association opened a discipline investigation and requested trust account records from the attorney. The documentation submitted by the attorney raised concerns about his compliance with trust account record-keeping rules. The Bar ultimately filed a formal petition for hearing alleging that the attorney had engaged in misconduct under Alaska Rule of Professional Conduct 1.15 (failing to safeguard and account for client funds) and Alaska Bar Rule 15(a)(4) (failing to respond to Bar Counsel's discovery requests and subpoena). The Area Hearing Committee granted the Bar's motion for summary judgment on Bar Rule 15(a)(4), but denied summary judgment on Alaska Rule of Professional Conduct 1.15 because the com-

mittee had insufficient information to determine whether trust misconduct had occurred.

The attorney produced a large number of records shortly before the hearing, and the committee held its hearing in abeyance to allow Bar Counsel time to review them. It instructed the parties to report back so it could determine whether a further hearing was necessary. The Bar filed a status report laying out its case and stating that it did not request another hearing, but the attorney did not respond. The Area Hearing Committee issued findings and conclusions establishing that the attorney had violated Alaska Rule of Professional Conduct 1.15; about one month later, it issued a recommendation that the attorney be suspended for four years.

Both parties appealed to the Disciplinary Board.[1] In his opposition brief to the Board, the attorney argued that the Area Hearing Committee had denied him due process by truncating its hearing before he had presented his full case. The Board allowed the attorney to submit any additional evidence he wished to have considered. After a second hearing, the Board issued a final order adopting the Area Hearing Committee's recommendation for discipline (and implicitly adopting the Area Hearing Committee's findings and conclusions). The attorney appeals. Based on our independent review of the record, we agree with the Disciplinary Board's recommended sanction.

## II. FACTS AND PROCEEDINGS

### A. Grievances And Subpoena.

On November 27, 2006, the Alaska Bar Association received a notice from Wells Fargo Bank that attorney John Rice's client trust account had insufficient funds to cover a $1,000 check Rice had written to himself. Wells Fargo subsequently sent the Bar Association two additional non-sufficient-funds (NSF) notices associated with separate instances of overdrafts from Rice's client trust account. Investigations were opened in connection with each NSF notice. Rice responded to the Bar Association regarding the

---

1. When the Bar Association Board of Governors acts on appeals of disciplinary matters, it is re-

ferred to as the "Disciplinary Board." Alaska Bar R. 10(a).

first two of these investigations, but not the third.

In February 2007, March 2007, and January 2008, the Bar notified Rice that it had opened discipline investigations in connection with each of the NSF notices. In its first two letters and a subsequent telephone call, the Bar directed Rice to submit his 2006 trust account records. Rice responded by providing 2006 bank statements for his client trust account and copies of some but not all checks for 2006.

In December 2007 Bar Counsel sent Rice a letter noting that Rice's accounting practices raised concerns "not only about the status of [his] trust account in 2006 but also about [his] compliance with the trust accounting rules during 2007 and to the present." The letter asked Rice to provide specific information, including the source and purpose of each deposit made to the trust account and the circumstances of two bounced $10,000 checks, along with documentation such as individual client ledgers and deposit slips for 2006 and 2007. Rice asked for additional time to comply with the Bar's request. By mid-April, however, Rice had not yet responded to the discovery requests, and on April 14, 2008, the Bar obtained a subpoena commanding Rice to produce, among other items, all paper and electronic records relating to his trust accounts, general office accounts, and individual client ledgers for 2006 and 2007.

Rice acknowledged the Bar's subpoena and indicated that he would respond. On July 17 the Bar received from Rice an unpadded manila envelope containing an unlabeled CD, broken in half and unreadable. There were no other documents in the envelope. Bar Counsel believed Rice knew the CD was broken when he sent it, although Rice disputes this. The Bar did not immediately inform Rice that the CD was broken.

### B. Motions And Formal Hearing Before The Area Hearing Committee.

The Bar filed a petition for formal hearing on October 1, 2008. It alleged that Rice had engaged in misconduct under Alaska Rule of Professional Conduct (ARPC) 1.15 by failing to safeguard and account for client funds, and under Alaska Bar Rule 15(a)(4) by failing to respond to Bar Counsel's discovery requests and subpoena. The petition recommended that, based on the American Bar Association Standards for Imposing Lawyer Sanctions, the appropriate sanction for Rice's misconduct was at least suspension. The petition gave notice that the CD Rice mailed to the Bar was broken when it arrived. Rice answered the petition, denying the Bar's allegations of misconduct under ARPC 1.15.

In February 2009 the Bar moved for summary judgment on its ARPC 1.15 and Bar Rule 15(a)(4) allegations. Rice did not initially file an opposition to the motion for summary judgment, because, as he later explained, he considered the motion to be "premature."

The Area Hearing Committee (Hearing Committee) held a pre-hearing conference on March 19, 2009. Shortly afterward, the Bar filed a motion to grant its unopposed motion for summary judgment and to close motion practice. On the same day, Rice filed a motion to reopen discovery, a motion to recuse Bar Counsel on the grounds that he was a witness in the formal hearing, and a motion for additional time to conduct discovery before filing his opposition to summary judgment. The Hearing Committee denied the motions to reopen discovery and recuse Bar Counsel, and ordered Rice to submit his opposition to the Bar's summary judgment motion within five days.

Rice opposed the summary judgment motion on May 11, 2009. In his opposition, he claimed that he had provided the Bar with all of the requested information on the CD and was never informed by the Bar (prior to the petition for formal hearing) that the disc had arrived broken. He also argued that the NSF charges, alone, were insufficient grounds for an investigation. The Hearing Committee heard oral argument on the summary judgment motion on May 13.

Rice filed motions to quash the Bar's subpoena and for a protective order on May 27. The first motion argued that "the subpoena was unnecessary and primarily sought by bar counsel to assist ... in arguing that respondent had not cooperated ... in its investiga-

tion." He also claimed that he would have sent a new copy of the CD, allegedly containing the requested information, if Bar Counsel had requested it prior to filing the petition for formal hearing. The second motion requested a protective order to preserve client confidentiality in any records Rice filed with the Bar. Rice also moved to stay the disciplinary hearing until completion of the investigation. The Bar opposed to the motion to quash and filed a qualified non-opposition to the motion for protective order. On June 25, Fred Triem entered his appearance as Rice's attorney and filed a motion to reschedule the hearing that had been set for July 8. The Hearing Committee rescheduled its hearing for August 3, but it did not address Rice's motion to quash the subpoena or his motion for a protective order.

On July 2 the Hearing Committee denied summary judgment on the alleged violation of ARPC 1.15, explaining that the committee was "handicapped by insufficient information as to ... whether there is a pattern of neglect or misuse" and noting that the issue would be ripe for decision after the scheduled evidentiary hearing. But the Hearing Committee granted summary judgment on the allegation that Rice had failed to cooperate with the Bar's investigation in violation of Bar Rule 15(a)(4).

Rice produced records in response to the Bar's subpoena on July 2, 2009. The Bar received more records from Rice on July 31, one business day before the August 3 hearing. On the morning of the hearing, Rice submitted hundreds of additional pages of accounting records. Bar Counsel objected at the hearing that the last-minute receipt of these records made it impossible to properly review and investigate them prior to the hearing. The Hearing Committee allowed Rice's documents to be discussed at the hearing, but a further complication was presented by the logistics of the hearing and Rice's last-minute production of documents. The hearing was held in Juneau; Rice and his attorney were in Juneau, but Bar Counsel participated from Anchorage. Rice was apparently aware that Bar Counsel planned to participate by telephone because he had the large additional set of responsive documents delivered to Bar Counsel's Anchorage office. He did not have a set prepared for the Hearing Committee to use in Juneau.

Bar Counsel presented the testimony of Deborah Ricker, the Bar discipline investigator/paralegal who had reviewed Rice's accounting records. Ricker testified that the records Rice submitted, while insufficient to form a "complete impression," were sufficient to indicate that there might be problems with client trust account management. She pointed to frequent withdrawals from the client trust account to Rice or to his general office account in even amounts and noted that this pattern raised questions about whether Rice was withdrawing unearned fees. Ricker also noted that the Client Trust Liability Register provided by Rice appeared to have been reconstructed after the fact, rather than kept contemporaneously with the recorded transactions. Upon examination by Bar Counsel, Rice acknowledged that he had not sent any information to the Bar between the time the Bar filed its formal petition and the time that Rice's counsel began producing documents on Rice's behalf. Rice expressed surprise at the extent of Bar Counsel's questions, claiming he "did not come here prepared to [talk] in detail about all of these hundreds of entries in these client registers."

During Bar Counsel's examination of Rice but before Rice's own counsel examined him, the Hearing Committee chair proposed that the hearing be held in abeyance to allow Rice and his attorney to work with Bar Counsel to produce a more complete record of Rice's accounting, after which the parties and committee could reconvene. The Hearing Committee chair described his decision as follows:

> I would like to order that both sides confer and make good faith efforts to produce a complete set of documentation, and by 'complete,' I mean sufficient to enable bar staff to make their own determinations as to the trust violation allegations ... and then report back with full documentation to the committee.... Maybe we won't even need more live hearings at that point; maybe we will; we'd have to confer at that point.

The Hearing Committee chair told the parties to report back by August 24, at which

point a decision would be made about whether further hearings were needed. At the end of the hearing, Rice's attorney brought up Rice's outstanding motions to quash the Bar's subpoena and for protective order. The Hearing Committee chair responded, "At the moment, we're not going to quash anything and we'll maintain the current arrangement we have for maintaining confidentiality" (i.e., if documents were released to parties outside the proceedings, all private information would be redacted).

### C. The Bar's Status Report And Hearing Committee Findings And Conclusions.

In response to the Hearing Committee chair's oral order, the Bar filed a status report on August 31. This report listed all the records produced by Rice before the August 3 hearing, as well as additional records produced four days after the hearing; these included canceled checks, detailed transaction sheets by client, and trust account registers. The Bar's status report explained why the Bar continued to allege violations of ARPC 1.15 and also stated that the Bar did not require further hearings.

Rice did not file a status report, nor did he respond to the Bar's status report. The Hearing Committee interpreted Rice's silence to mean that he and his lawyer had "indicated to the Committee that neither intended to present more testimony on the topic of whether violations had occurred."

On October 2, 2009, the Hearing Committee issued its findings and conclusions. After reiterating its earlier grant of summary judgment regarding violations of Bar Rule 15(a)(4), the Hearing Committee addressed the Bar's allegations under ARPC 1.15(a) and (b) and stated, "[w]hen repeated NSF checks occur and a trust account is used as an auxiliary repository for the lawyer's own funds, there is certainly evidence of neglect or misuse of the trust account sufficient to violate ARPC 1.15." The Hearing Committee went on to detail problems and inconsistencies associated with the trust funds of several specific clients, concluding from these

client accounts that "Mr. Rice regularly removed client funds from trust accounts before they were invoiced or earned, and in amounts that bore little or no relation to any . . . invoice" and that these withdrawals left the trust accounts "regularly short of funds." It also found evidence of commingling of attorney and client funds.

### D. Sanctions Briefing And Hearing Committee Recommendation On Sanctions.

Concurrent with the findings and conclusions, the Hearing Committee chair issued an order addressing briefing on sanctions. The order gave notice that Rice's counsel should notify the Bar office if he wished to request a sanctions hearing. The Bar timely filed a sanction brief in which it argued that the ABA guidelines for disciplinary sanctions,[2] as well as prior Alaska case law, called for Rice's disbarment. Rice did not ask for a hearing on sanctions, nor did he file a brief addressing sanctions.

The Hearing Committee issued its recommendation on sanctions at the end of October 2009. It found that Rice's lack of prior disciplinary violations was a mitigating factor, but that his willful failure to cooperate with the Bar's investigation was an aggravating factor. Having considered prior disciplinary case precedent as well as the ABA guidelines, the Hearing Committee recommended that Rice be suspended for four years, with one year of the suspension stayed on the condition that Rice inform his past clients of his suspension and urge them to contact the Bar if they believed their trust funds had not been properly applied or refunded.

Rice filed a motion for reconsideration of the recommendation on sanctions. He also requested a hearing and argued that he had relied on the Hearing Committee's statement in its findings and conclusions that it would hold a hearing on sanctions. The Hearing Committee denied Rice's motions for reconsideration and further hearing, explaining that the Order on Briefing on Sanctions had explicitly required Rice to notify the committee if he wanted a sanctions hearing. By

2. AMERICAN BAR ASSOCIATION, STANDARDS FOR IMPOSING LAWYER SANCTIONS 1 (2005), http://www.abanet.org/ cpr/regulation/standards_sanctions.pdf (hereinafter ABA Standards).

failing to do so, the committee reasoned, Rice "waived ... his opportunity to submit argument on sanctions."

### E.  Appeal To Disciplinary Board.

The Bar appealed the Hearing Committee's recommendation, arguing that Rice should be disbarred rather than suspended. Rice cross-appealed on the appropriate sanction but also appealed on a number of other grounds.  Among other things, he argued that the recommended four-year suspension was too harsh in light of his cooperation with the Hearing Committee and maintained that he did not act dishonestly, keep client funds, or harm any clients.  Rice also contested the Hearing Committee's conclusion that he violated Bar Rule 15(a)(4), arguing that he had eventually provided all requested information and had only delayed doing so because he was waiting for the Hearing Committee to rule on his motions for protective order and to quash the subpoena.

Pursuant to an order from the Disciplinary Board, the Bar and Rice each submitted opening briefs to the Board, followed by simultaneous opposition briefs.  In his opposition brief, Rice raised the issue of due process for the first time, arguing that the Hearing Committee: (1) denied him due process by truncating its formal hearing before Rice put on his defense; and (2) converted the Bar's status report into a motion for summary judgment without giving him notice of its intent to do so and allowing him to respond to new evidence.

The Disciplinary Board convened on January 29, 2010.  Bar Counsel reiterated his argument that the ABA Standards for Imposing Lawyer Sanctions justified disbarment in this case.  Rice's counsel acknowledged that the issue before the Board was the appropriate sanction for Rice's misconduct, but contrasted Rice's situation with that of other Alaska attorneys who received multi-year suspensions for what he argued were more serious offenses.  Rice's counsel also argued that it should be considered a mitigating factor that Rice provided the data with which the Bar built its case and repeated the due process argument raised in Rice's opposition brief.

The Disciplinary Board issued an order allowing Rice to submit any new documentary evidence he wished the Board to consider regarding the Hearing Committee's findings and sanction recommendation, and allowing him to request a hearing before the Disciplinary Board to present sworn testimony. Rice timely filed an affidavit, copies of trust account and general account checks, and a request for a hearing before the Board at its regular April meeting.

The Disciplinary Board reconvened on April 26, 2010.  The Board first addressed Rice's objection to the participation of two Board members who had not been present at the first hearing and decided to allow those members to participate.  Rice's attorney then corrected a misstatement he had made at the previous hearing to the effect that Rice did not keep individual ledger cards for his clients; he stated that Rice *did* keep individual ledger cards and sought to withdraw "the suggestion that discipline [was] appropriate because of the admission that [he] should not have made."  Rice's attorney acknowledged that the individual client ledgers had not been produced to the Board, contending that it was not "within the scope of the authority of the [D]isciplinary [B]oard to conduct a plenary evidentiary hearing" because its purpose was to serve as a reviewing court.  Instead, Rice requested remand for a full evidentiary hearing before the Hearing Committee.  Rice's counsel also argued that Rice's testimony itself served as adequate proof that he had maintained individual client ledgers, even though those ledgers had not been produced.

Rice testified on his own behalf.  In response to questions from members of the Board and his own counsel, he attempted to explain the circumstances behind each of the NSF notices issued by Wells Fargo.  He cited various causes for the overdrafts, including an allegedly unauthorized withdrawal by GCI for a telephone bill and that an associate accidentally drafted a check out of Rice's client trust account rather than his business account.  Rice stated that he had closed his client trust account shortly after July 30, 2009, and had stopped taking clients who requested that he hold money for them

in trust. The Bar did not present evidence or argument at this hearing.

On April 27 the Board issued a final order adopting the Hearing Committee's recommendations regarding sanctions. Rice appeals the Board's decision.

## III. STANDARD OF REVIEW

■■■ We have noted that "[t]he appropriate standard of review for attorney disciplinary proceedings is well established."[3] "Though this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight."[4] Thus, "[w]here findings of fact entered by the Board are challenged on appeal to this court, ... the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous.... As a general rule ... we ordinarily will not disturb findings of fact made upon conflicting evidence...."[5]

■■■ We apply our independent judgment when determining the appropriate sanctions in cases of attorney discipline; we "need not accept the Disciplinary Board's recommendation."[6] Our determination of sanctions is guided by the American Bar Association's Standards for Imposing Lawyer Sanctions,[7] but is "not constrained" by them.[8]

## IV. DISCUSSION

A. **The Hearing Committee And Disciplinary Board Did Not Deny Rice Due Process.**

1. **The Hearing Committee properly granted summary judgment on Rice's failure to cooperate with the Bar's requests for information.**

Rice contends that the Hearing Committee's grant of summary judgment against him on the grounds of his failure to cooperate under Alaska Bar Rule 15(a)(4) was im-

proper for three reasons: (1) there was a genuine issue of material fact as to whether Rice deliberately broke the CD he sent to the Bar; (2) when it became clear that the Hearing Committee was not going to rule on his motions for protective order or to quash the subpoena, Rice submitted the requested documents; and (3) Rice's motions to quash the Bar's subpoena and for protective order were pending at the time the Hearing Committee granted summary judgment. We find these arguments unconvincing.

■■■ First, we observe that none of the Hearing Committee's conclusions rely upon disputed issues of fact. The language cited by Rice for this claim simply reflects what the record clearly shows: the CD did, in fact, arrive in an unusable state, and although Rice expressed his willingness to provide the information, he had not provided it by the time the Hearing Committee issued its order granting summary judgment in July 2009. The Hearing Committee did not find that Rice broke the CD. Its determination that Rice violated Bar Rule 15(a)(4) was based on Rice's continuing failure to provide the subpoenaed information *after* he learned from the October 1, 2008 petition for formal hearing that the CD had arrived broken—regardless of what caused it to break. It was never fully resolved how the CD broke, but this issue was not material to the Hearing Committee's decision and did not preclude entry of summary judgment.

The fact that Rice eventually provided information requested by the Bar does not excuse his earlier delays, particularly given that the record suggests Rice never provided all of the requested information. For instance, although Rice's attorney argued before the Disciplinary Board that he supplied information to the Bar in satisfaction of the subpoena, he also acknowledged that the individual client ledgers requested in the subpoena had not been produced to the Bar, the

---

**3.** *In re West,* 805 P.2d 351, 353 n. 3 (Alaska 1991).

**4.** *Id.* (quoting *In re Simpson,* 645 P.2d 1223, 1226–28 (Alaska 1982), *methodology modified* by *In re Buckalew,* 731 P.2d 48 (Alaska 1986)).

**5.** *Id.*

**6.** *Id.*

**7.** *See In re Buckalew,* 731 P.2d at 51–52.

**8.** *In re Frost,* 863 P.2d 843, 854 (Alaska 1993).

Hearing Committee, or the Disciplinary Board.[9]

■ Second, Rice argues that "[b]ecause [he] supplied the very information on which the Hearing Committee found an ethical violation, the Hearing Committee order granting summary judgment on [his] failure to cooperate should be reversed." But this argument overlooks Rice's duty under Bar Rule 15(a)(4) and the subpoena to provide all the documentation requested by the Bar for its investigation. The fact that the information he *did* provide proved sufficient for the Bar to demonstrate trust accounting violations did not relieve him of his duty, nor does his partial and reluctant compliance constitute a mitigating factor.

■ Finally, Rice's motion to quash the Bar's subpoena and motion for protective order did not explain his failure to cooperate with the Bar's investigation prior to filing those motions. The subpoena was issued in April 2008. The Bar received the broken CD on July 17, 2008. On October 1, the Bar filed its petition for formal hearing, stating that the CD had arrived broken. By the time the Bar moved for summary judgment on February 18, 2009, Rice had known for four and a half months that the CD had arrived broken, but he did not resubmit the requested information in order to comply with the subpoena. Rice then waited another three months before filing his motions to quash the subpoena and for protective order. (The Hearing Committee ultimately granted summary judgment on Bar Rule 15(a)(4) on July 2, 2009; it subsequently addressed Rice's motions at its August 3 hearing, when the Hearing Committee chair stated, "At the moment, we're not going to quash anything and we'll maintain the current arrangement we have for maintaining confidentiality.") We hold that Rice's delay during this nearly eight-month period (October to May) was sufficient to constitute a violation of Bar Rule 15(a)(4)

for failure to furnish information and respond to requests from Bar Counsel and the Hearing Committee. Rice's subsequently filed motions do not retroactively cure this violation.

We further observe that Rice's failure to cooperate persisted throughout the proceedings. Rice produced hundreds of pages to the Bar immediately before the August 3 hearing, making it difficult for the Bar to prepare. More problematically, Rice did not provide copies of those records to the Hearing Committee in Juneau, forcing committee members to examine a document at one point during the hearing by viewing defense counsel's laptop computer.[10] Rice has repeatedly referred to documents and information—most notably individual client ledgers—that he claims to be able to provide but has not produced. Even as late as his oral argument before our court, Rice's attorney argued that Rice had access to client ledger cards he was willing to produce, but acknowledged that this data had not been submitted at earlier stages of the proceedings.

### 2. Rice waived his right to a further hearing on the issue of his alleged accounting misconduct.

■ Rice argues that the Hearing Committee "improperly truncated [his] evidentiary hearing on [August 3, 2009] by receiving evidence only from the Bar but not from Rice[ ]—thus denying Rice his 'day in court,' and his opportunity to be heard." The Bar contends that "the Committee did not deny Rice a hearing"; rather, Rice "elected to not testify or present any further defense," agreeing "by his silence" with the conclusion in the Bar's status report that further hearings were unnecessary.

Under Alaska Bar Rule 22, a responding attorney is entitled to a hearing on disciplinary allegations and is generally not required to request the opportunity to examine wit-

---

**9.** Rice's attorney attempted to justify the failure to provide these documents by arguing "that either the Area Hearing Committee should have granted the motion to quash, or should have granted some protective order to protect the identity of the clients" identified in the ledgers. This reasoning is inconsistent with Rice's claim that, once he understood that the Hearing Com-

mittee was not going to rule on his motions, he fully complied with the subpoena.

**10.** As the Bar notes in its brief, it was unable to "provide the Committee, in Juneau, with records [it] received that day in Anchorage."

nesses or present evidence. The exchanges between Rice's attorney and the Hearing Committee chair at the August 3 hearing tended to suggest that a follow-up hearing would occur: Rice's attorney said, "I do think that it's inevitable that we're going to need at least some time [with] all of us together again in a live hearing, so that I can put on my defense." The Hearing Committee chair replied: "You have the right to put on a live witness, present your defense. We will never deny you that."

At the same time, the Hearing Committee made it clear that Rice and the Bar were to report back later that month, after reviewing the late-produced discovery and gathering additional evidence, so that the Hearing Committee could determine whether further hearings were necessary. On August 31 the Bar submitted a status report indicating that it was resting its case: the report claimed that "the evidence in the record already proves the violations charged in the petition for formal hearing" and concluded, "the Bar does not intend to further examine Rice ... [or] to call any other witnesses or introduce any evidence beyond what is submitted and discussed with this report. The Bar does not request any further hearings and withdraws all previous requests for hearings." By declining to request a hearing and arguing that the Hearing Committee could reach a decision without additional evidence, the Bar's status report put Rice on notice that he would need to request a hearing if he wanted one. But Rice did not do so. Nor did he file his own status report in the month before the Hearing Committee issued its findings and conclusions, or otherwise respond to the Bar's claim that the evidence in the record was sufficient to prove its case against him.

If the failure to verify whether Rice wanted to continue the hearing before the Hearing Committee issued its recommendations did constitute a due process violation, Rice waived any due process claim by neglecting to raise it until midway through his appeal to the Disciplinary Board. The Hearing Committee issued its findings and conclusions and requested briefing on sanctions on October 2, clearly indicating that it had made its decision and did not plan to hold another hearing. Rice did not file an objection to the issuance of the decision. The Bar filed a sanctions brief; Rice did not respond. After the Hearing Committee issued its recommendation on sanctions at the end of October 2009, Rice filed a motion for reconsideration of the sanctions recommendation. This motion did not raise the due process issue. The motion was denied and Rice appealed to the Disciplinary Board. His opening brief before the Disciplinary Board did not raise a due process argument. In fact Rice did not, at any of these stages, even hint at due process concerns arising out of the Hearing Committee proceedings. His due process claims appeared for the first time in his opposition brief to the Disciplinary Board, filed on January 8, 2010. Because that briefing schedule called for simultaneously filed opposition briefs, Rice's due process argument was first raised at a time when the Bar had no opportunity to respond. We conclude that raising due process claims at this late stage, after the Bar had filed its final brief to the Disciplinary Board, was not sufficient to preserve Rice's due process argument.[11]

Rice's attorney acknowledged to the Disciplinary Board that due process was a "new issue," first raised in his opposition brief. But he argues that the due process argument was not waived because the Hearing Committee's actions constituted plain error.[12]

---

**11.** Rice also claims that the Hearing Committee "converted" the Bar's status report into a dispositive motion without giving notice that it was doing so. He contends this was impermissible by analogy to this court's rulings on conversion of a 12(b)(6) motion to a motion for summary judgment. We disagree with this characterization. The Hearing Committee had stated in its earlier summary judgment decision that the issues raised under ARPC 1.15 would be "ripe for decision after the evidentiary hearing" thus providing notice that it would be prepared to rule on the issue. The Hearing Committee had already received extensive documentary evidence and heard a day of testimony. Seen in this light, the Hearing Committee's ultimate ruling was not a grant of summary judgment, but rather a decision following an evidentiary hearing consisting of Rice's testimony, earlier-submitted evidence, and the supplemental evidence cited in the Bar's status report; there was no "conversion" requiring additional notice to Rice.

**12.** *Evron v. Gilo*, 777 P.2d 182, 186 (Alaska 1989) (citing *In re L.A.M.*, 727 P.2d 1057, 1059

We acknowledge it would have simplified matters if the Hearing Committee had issued explicit notice that unless Rice requested a hearing, it would go forward and consider the merits of the Bar's position. But we hold that the Hearing Committee's instructions were adequate. Further, the Disciplinary Board allowed Rice to submit any additional evidentiary support or testimony he wished to have considered. Any due process violation at the Hearing Committee level was waived—and rendered harmless by the additional due process offered by the Board.

### 3. The Disciplinary Board did not deny Rice due process.

We find that Rice waived any due process claim he may have had, but we also observe that the Disciplinary Board's order allowing Rice to submit additional documents and testimony was likely sufficient to cure the due process violation Rice alleges.[13] Rice argues that the Board's decision to take additional evidence was a separate due process violation because the Board's role should be limited to reviewing the work of the Hearing Committee. Contrary to Rice's argument that the Board "abandoned its appellate function" by taking evidence, Bar Rule 10(c) gives the Board power to "review and modify the findings of fact, conclusions of law, and recommendations of Hearing Committees."[14] Further, though Rice contends on appeal that the Board's decision to accept additional evidence denied his right to appellate review, the record shows the Board gave written notice of its decision to accept whatever additional evidence Rice wished to have considered, and Rice did not object.

Rice makes two additional claims that the Disciplinary Board violated due process. First, he argues that the Board improperly "changed its composition by adding two members at the second hearing who had not been present at its first session." Rice relies on "analogous authority" requiring the parties' consent to changes in the jury panel during a trial. But this analogy is inappropriate. Members of the Board, like members of an appellate court, may independently review both the record below and any segments of the Board proceedings that they may have missed. The record shows that two Board members who were not present at Rice's first hearing stated they had read the transcript of the earlier Board hearing.

Rice also objects to the part of the Board's sanctions order providing for a one-year stay of suspension on the condition that Rice inform past clients of his discipline and encourage them to inform the Bar if they believe their trust funds were improperly applied or refunded. Rice contends that this provision "reverses the burdens" by requiring Rice to "prove that he has *not* violated the Rules of Professional Conduct," rather than requiring the Bar to prove the opposite by clear and convincing evidence. This argument is unconvincing. The Bar was required to prove Rice's misconduct by clear and convincing evidence in order to trigger sanctions in the first place, and the condition—which provides Rice the opportunity to decrease the length of his suspension—is entirely optional. Rice has not shown that the discipline condition recommended by the Hearing Committee and adopted by the Board denied him due process.

### B. The Disciplinary Board Imposed An Appropriate Sanction On Rice.

We apply our independent judgment when determining appropriate attorney sanc-

---

(Alaska 1986)) (arguments not raised before trial court generally considered waived on appeal, but "[t]hat rule is limited by the doctrine of plain error which allows consideration of points not raised at the trial level if the judicial action was obviously erroneous ...."); *see also Yost v. State, Div. of Corps., Bus. and Prof'l Licensing*, 234 P.3d 1264, 1275 n. 40 (Alaska 2010).

13. *See City of N. Pole v. Zabek*, 934 P.2d 1292, 1298–99 (Alaska 1997) (holding that a "post-

hearing supplementation of the record with witness affidavits" cured earlier due process violation); *McMillan v. Anchorage Cmty. Hosp.*, 646 P.2d 857, 866–67 (Alaska 1982).

14. Alaska Bar R. 10(c)(5); *see also In re Brion*, 212 P.3d 748, 754–55 (Alaska 2009) (holding that although "[t]his was an oral argument, not an evidentiary hearing," the Board's questions during oral argument were "appropriate to the setting").

tions.[15] In this case, independent review leads us to agree with the Disciplinary Board recommendation that Rice be subject to a four-year suspension, with one year conditionally stayed. This conclusion is consistent with both the ABA Standards for Imposing Lawyer Sanctions and our own precedent.

### 1. The ABA Standards for Imposing Lawyer Sanctions support Rice's suspension.

The American Bar Association has developed standards for imposing lawyer sanctions, by which we are guided but "not constrained."[16] Under the ABA model, a court imposing sanctions must consider four factors: (1) the duty breached by the attorney; (2) the attorney's mental state; (3) the injury caused by the attorney's actions; and (4) aggravating and mitigating factors.[17] The initial determination of the appropriate sanction is made after the court addresses the first three factors. After its initial sanction determination, the court considers aggravating and mitigating factors to determine whether the sanction should be increased or decreased according to specific circumstances.[18]

#### a. Duty

Rice's trust accounting violations breached his duty to clients under ABA Standard 4.1, Failure to Preserve the Client's Property. In addition, Rice's trust accounting violations breached his duty to the public under ABA Standard 5.1, Failure to Maintain Personal Integrity. The latter provision covers "cases involving commission of a criminal act that reflects adversely on the lawyer's honesty [and] trustworthiness ... or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation." Rice emphasizes that he was "not found by the Area Hearing Committee to have engaged in either felonious or dishonest conduct." But the Hearing Committee's finding that Rice "knowingly ... misappropriated client funds" by making uninvoiced payments to himself implies conduct that violates the duty to maintain personal integrity, even though the Hearing Committee did not find criminal conduct.

By failing to produce records in cooperation with the Bar's investigation, Rice violated Alaska Bar Rule 15(a)(4). He breached his duty to the legal system under ABA Standard 6.2, Abuse of the Legal Process, which covers "cases involving failure to expedite litigation or bring a meritorious claim, or failure to obey any obligation under the rules of a tribunal."

#### b. Mental state

The ABA Standards model assumes three possible mental states: intent ("when the lawyer acts with the conscious objective or purpose to accomplish a particular result"), knowledge ("when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result"), and negligence ("when a lawyer fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in that situation").[19] The Hearing Committee found that Rice acted "knowingly" (albeit not necessarily with the intent to deprive his clients of property) by commingling and misappropriating client funds and by failing to keep adequate records. The Disciplinary Board implicitly adopted these findings of fact when it adopted the Hearing Committee's recommendations. Rice has not met his burden of

---

15. *In re West*, 805 P.2d 351, 353 n. 3 (Alaska 1991).

16. *In re Frost*, 863 P.2d 843, 854 (Alaska 1993); *see also In re Buckalew*, 731 P.2d 48, 51–52 (Alaska 1986).

17. ABA Standards, Theoretical Framework.

18. ABA Standard 9.0. Aggravating factors set out in the ABA Standards include prior disciplinary offenses, selfish motive, multiple offenses,

bad faith obstruction of the disciplinary proceeding, substantial experience in the practice of law, and illegal conduct, among others. *Id.* Mitigating factors include the absence of prior offenses, personal or emotional problems, cooperation with the disciplinary board, character or reputation, and remorse. *Id.*

19. ABA Standards, Theoretical Framework.

demonstrating that the Hearing Committee's findings were incorrect.[20]

The Hearing Committee further found that Rice "willfully" failed to cooperate with the Bar's investigation, thus imputing intent to Rice's behavior. Rice has failed to discredit this finding. As discussed, the primary explanation Rice offered for his failure to submit subpoenaed documents, i.e., that he had pending motions to quash the Bar's subpoena and for a protective order, is unavailing. For several months before Rice filed these motions, he knew of the subpoena and he was aware that the CD had arrived broken at the Bar's office. Yet he still failed to respond to the Bar's request. This ongoing refusal to comply with the Bar's unambiguous request supports the finding that Rice acted with intent when he failed to cooperate.

### c. Injury

Under the ABA Standards, "[t]he extent of the injury is defined by the type of duty violated and the extent of actual or potential harm."[21] Rice emphasizes repeatedly in his briefing that he was not found to have caused financial loss to any client and that the potential harm to clients posed by his trust accounting practices was limited by his "careful safeguarding of funds so that at all times he held the funds necessary to meet all of his fiduciary obligations." But, as the Hearing Committee noted in its findings and conclusions, Rice's ability to cover his obligations relied in part on a mistaken view of trust funds as fungible assets, such that one client's funds could be used to pay another client. Moreover, the Hearing Committee determined that Rice may have simply been "very lucky in being able to manipulate account balances to cover his need to provide funds," masking a high potential for harm to his clients. We have held that "the public suffers injury whenever a lawyer fails to maintain personal integrity by improperly handling funds held in trust."[22]

We agree with Bar Counsel that Rice's violation of Alaska Bar Rule 15(a)(4) delayed an accounting, causing potential harm to clients whose money was exposed to mismanagement for a longer period of time, and harmed "the reputation of the legal profession for integrity, competence, and effective self-regulation."

### d. Initial sanction determination

ABA Standard 6.21 provides that disbarment is appropriate "when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding." By failing to respond to the Bar's subpoena, Rice intended to obtain the "benefit" of delaying and impeding the Bar's investigation; his delay—which arguably lasted from the time of the Bar's initial records request up through the present, given his continuing failure to produce some of the requested information—caused serious interference with the investigation and the formal proceedings that followed from it. Disbarment is therefore a permissible sanction under ABA Standard 6.21.

Under ABA Standard 4.12, "[s]uspension is generally appropriate when a lawyer knows or should know he is dealing improperly with client property and causes injury or potential injury to a client." Rice's actions caused at least potential injury to his clients. It also appears that, consistent with the Hearing Committee's findings, his misappropriation of client property was "knowing"; Rice knowingly paid himself out of client trust funds

---

20. As noted above, "[w]here findings of fact entered by the Board are challenged on appeal to this court, ... the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous." *In re West*, 805 P.2d at 353 n. 3. Rice admitted to knowingly commingling funds, acknowledging that he "always kept some funds of [his] own in the client trust account." He failed to provide any evidence of his claim that he properly invoiced all withdrawals and has offered no arguments on appeal to challenge the Board's finding of knowing misappropriation, other than the unsupported contention that the absence of client complaints implies no misappropriation occurred.

21. ABA Standards, Theoretical Framework.

22. *In re Friedman*, 23 P.3d 620, 631 (Alaska 2001).

without having properly invoiced clients for services (regardless of whether he believed he had earned the payments), thus violating his fiduciary duties. The initial sanction indicated under ABA Standard 4.12 is suspension.

### e. Aggravating and mitigating factors

Rice argues that a number of the issues the Bar considers to be aggravators are actually mitigators. For example, he claims he cooperated with the Bar and that his "cooperation in providing the documents used to convict him should actually be a mitigator." He also argues that the Hearing Committee should have considered as a mitigator the fact that none of his clients was harmed or even complained. We do not find these arguments convincing. As noted above, the fact that the documents Rice provided were used to establish the Bar's case against him does not excuse his failure to provide other documents requested by the Bar and to otherwise cooperate with the Bar's investigation. The fact that no client was shown to suffer a financial loss is not a mitigating factor; potential harm is sufficient to trigger even the most severe sanctions under the ABA model.[23] Further, the lack of client complaints only establishes that no client was aware of any misconduct on Rice's part.

The Bar, meanwhile, argues that "[p]ractically every aggravator listed in ABA Standards ... 9.22(a)-(k) applies to Rice." Specifically, the Bar cites what it characterizes as Rice's dishonest and selfish motives, repeat and multiple offenses, bad faith obstruction of the discipline process, false and deceptive conduct, lack of remorse, exploitation of vulnerable clients, substantial legal experience, and potential criminal conduct. The Bar contends that Rice's only mitigating factor is his lack of a prior discipline record. We judge this assessment to be too harsh. Rice engaged in repeat offenses and obstructed the discipline process; he does have substantial legal experience and has exhibited no remorse. But his trust accounting misconduct, although "knowing" and potentially harmful, does not seem to have had the bad intent which the Bar attributes to it. Nothing in the record indicates that he had "dishonest and selfish motives" beyond an unwillingness to comply with accounting requirements, or that he engaged in "deceptive conduct" (except to the extent that taking client payments without proper documentation is intrinsically "deceptive"). Admittedly, there is also little in the record to definitively exclude less benign interpretations of Rice's behavior, but the Bar has the burden of demonstrating its initial charges against a respondent attorney. Thus, we exclude these factors from the applicable aggravators in evaluating the appropriate sanction for Rice's conduct.

The ABA Standards do not provide guidance on how mitigating and aggravating factors are to be weighted in determining sanctions.[24] In the absence of such guidance, we are inclined to place a great deal of weight on the absence of dishonest and selfish motives, which seems to distinguish Rice's conduct from more serious offenses such as the deliberate and calculated theft of client funds. Rice's conduct is more accurately summarized as irresponsible accounting and estimated, uninvoiced (but, in Rice's view, not unearned) payments to himself. The absence of dishonest and selfish motive, combined with the fact that Rice has no prior disciplinary offenses, is sufficient to reduce his punishment from the disbarment indicated under ABA Standard 6.2 to suspension. The appropriate period of suspension is further analyzed below, with reference to our precedent for attorney discipline.

### 2. Alaska case law supports the recommended four-year suspension.

We have previously issued holdings in a number of cases dealing with client trust

---

23. *See, e.g.,* ABA Standard 4.11 (providing that "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury *or potential injury* to a client") (emphasis added).

24. *See In re Buckalew,* 731 P.2d 48, 54 (Alaska 1986) ("There is no 'magic formula' to determine which or how many mitigating circumstances justify the reduction of an otherwise appropriate sanction. Each case presents different circumstances which must be weighed against the nature and gravity of the lawyer's misconduct.").

fund misconduct by attorneys. In order to provide context for the unique facts of this case, we focus here on five cases representing the spectrum of offenses and sanctions in the trust fund misconduct category.

In *In re Mann*, an attorney misappropriated $2,001 obtained on a referral collection for the benefit of another law firm and used the money to make mortgage payments on his home.[25] He subsequently turned himself in (resulting in a criminal conviction for misapplication of property), returned the misappropriated funds, and publicly informed the community of his misconduct.[26] We noted that disbarment would typically be the appropriate sanction for Mann's conduct, but held that mitigating factors, chiefly Mann's voluntary disclosure, restoration of the misappropriated funds, and remorse, reduced the appropriate sanction to a three-year suspension.[27]

In *In re Friedman*, an attorney deposited an $81,000 settlement contribution in his client trust account. Without permission from the other plaintiffs' attorneys, he then drew on the account to advance funds to his client and pay himself attorney's fees in the case that were not yet due. He also later drew on the trust account to pay himself fees in the unrelated matters of five other claimants before he had deposited settlement funds in those matters.[28] We held that Friedman had engaged in misconduct including "dishonest conduct"[29] and "illegal conduct involving moral turpitude,"[30] violations that called for disbarment, absent mitigating factors.[31] Taking mitigators into account, however, we found that Friedman's misconduct was similar to Mann's and that a similar three-year suspension period was therefore

appropriate. We noted that Mann had taken less money than Friedman and had self-reported, but cited several circumstances that convinced us a longer suspension would be too harsh: "(1) Friedman's lack of a prior disciplinary record; (2) the absence of loss or injury to his clients; (3) his undisputed dedication to his clients and outstanding commitment to pro bono and public service; and (4) the significant measures that Friedman took to remedy the problems caused by his conduct."[32]

In *In re Brion*, an attorney was charged with misconduct relating to failure to perform client services with reasonable diligence and promptness and failure to communicate with clients regarding legal matters and fees.[33] Bar Counsel also charged him with failing to account properly for client funds; Brion overdrew a trust account on one occasion and "misrepresented the source of the money he deposited in the trust account to correct the overdraft."[34] We applied the ABA sanctions standards for cases involving lack of diligence and found that suspension was the appropriate sanction; based on the aggravating factors in the case (including multiple offenses, the vulnerability of Brion's out-of-state clients, and Brion's substantial legal experience), we imposed a three-year suspension, with two of those years stayed.[35]

In *In re Stepovich*, Bar Counsel determined that an attorney had "failed to maintain sufficient funds in his operating account to cover shortages in his trust account throughout ... 1996–2003"; on one occasion, Stepovich waited five months to disburse settlement monies to a client, then wrote the client a check that was returned for insuffi-

---

25. *In re Mann*, 853 P.2d 1115, 1116 (Alaska 1993).

26. *Id.*

27. *Id.* at 1119–20. This court noted, "Although we do not condone Mann's misappropriation of funds, we commend his voluntary disclosure and genuine regret." *Id.* at 1120.

28. *In re Friedman*, 23 P.3d 620, 623 (Alaska 2001).

29. *Id.* at 625–27.

30. *Id.* at 629. We noted, "Friedman's conduct, if committed in Alaska, would have violated AS 11.46.620(a) and would have been a Class C felony." *Id.* at 632.

31. *Id.* at 631.

32. *Id.* at 634.

33. *In re Brion*, 212 P.3d 748, 750 (Alaska 2009).

34. *Id.*

35. *Id.* at 752.

client funds.[36] The Disciplinary Board found that this amounted to misappropriation of client funds.[37] We imposed a three-year suspension, with one year stayed.[38]

In *In re Buckalew,* an attorney embezzled $67,000 from two client trust accounts in order to pay clients in another matter that he falsely claimed to have settled.[39] We held that "Buckalew's misconduct included defrauding a client by fabricating a 'settlement agreement' and intentionally representing the same as genuine, abuse of the legal process by forging a judge's signature, and the embezzlement of client funds, in violation of state and federal law"[40] and that the ABA Standards would generally require disbarment for such misconduct.[41] Although the Disciplinary Board had recommended a five-year suspension based on mitigating factors, we determined that the relevant mitigators (including the fact that Buckalew had no prior record of misconduct and had turned himself in only after his misconduct was discovered by a colleague) were not sufficient to preclude disbarment in light of "the severity of Buckalew's misconduct."[42]

Both parties devote extensive portions of their briefs to identifying the points of similarity and distinction between these cases and Rice's. Rice argues that *Friedman, Stepovich, Mann,* and *Brion* are distinguishable on various grounds: Friedman was found to have engaged in illegal activities, Stepovich was found to have harmed a client, Mann took client trust funds that he had not earned, and Brion (who received a relatively lenient sanction) was cited for lack of diligence and failure to communicate with his clients as well as for trust fund violations. We do not find these points of distinction particularly compelling. It is true that, unlike *Friedman,* the Hearing Committee in

this case did not explicitly find that Rice had engaged in illegal activities, but it did find that Rice had "misappropriated client funds." Rice may not have caused actual harm to clients as he argues Stepovich did, but he did cause them potential harm, which is sufficient under the ABA Standards to justify even the harshest sanctions;[43] and he did arguably cause actual harm to public trust in the legal system. Based on the Bar's analysis of Rice's records, the Hearing Committee concluded that Rice, like Mann, appeared to have paid himself funds he had not yet earned; Rice provided no evidence of client invoicing to challenge this conclusion. And although Rice was not cited for lack of diligence as Brion was, his trust account misconduct appears to have been more extensive than Brion's single trust account overdraft. Moreover, unlike Friedman, Mann, or Stepovich, Rice failed to cooperate with the Bar's investigation in addition to his trust accounting misconduct.

The Bar emphasizes that there were mitigating factors in the cited cases that are not present in Rice's case. For example, it notes that Mann's misconduct was "isolated compared to Rice's" and that Mann, unlike Rice, turned himself in. Similarly, the Bar argues that, "[u]nlike Friedman, Rice cannot show that he harmed no client ... [,] has no record of dedication to clients or public service ... [,] tried to conceal his problems and blamed the Bar, and ... still denies misconduct." The Bar contends that Rice's conduct was closest to Buckalew's insofar as each attorney "misappropriated large sums, over a long time, and tried to conceal it," "offend[ing] public trust" by his misconduct. While we agree that Rice lacked a number of the mitigating factors present in *Mann* and *Friedman,* the Bar's comparison to *Bucka-*

36. *In re Stepovich,* 143 P.3d 963, 964 (Alaska 2006) (Fabe, J., dissenting).

37. *Id.*

38. *Id.* at 963–64.

39. *In re Buckalew,* 731 P.2d 48, 49 (Alaska 1986).

40. *Id.* at 53.

41. *Id.* at 54.

42. *Id.* at 54–55. Because Buckalew would be eligible for conditional readmission to the bar after five years of disbarment, the disbarment sanction was functionally the same as the five-year suspension recommended by the Bar and consented to by Buckalew. However, this court noted that the "more severe connotation" of "disbarment" made it appropriate to the situation. *Id.* at 55–56.

43. *See, e.g.,* ABA Standard 4.11.

*lew* is misplaced. Buckalew misapplied a large sum of money as part of a larger scheme to deceive clients into accepting a fabricated settlement agreement. Rice's misappropriations and overdraws appear to have been, at least in part, the result of irresponsible accounting and invoicing practices, and were not accompanied by additional attempts to mislead his clients.

Based on our analysis of the relevant case law, we hold that the four-year suspension recommended by the Disciplinary Board is appropriate. Rice's trust accounting misconduct was probably most similar to that of Friedman and Stepovich; in all three cases, attorneys withdrew funds from client trust accounts in advance of having earned—or at least properly invoiced—them, but they do not appear to have intended to permanently deprive clients of money. Friedman received a three-year suspension, while Stepovich received a three-year suspension with one year stayed. Like Friedman, Rice had no record of prior misconduct. But unlike Friedman, who introduced substantial evidence of his public service and the quality of his work, there is no evidence in the record of Rice's prior history of service to clients. More importantly, Rice, unlike either Friedman or Stepovich, was found to have deliberately interfered with the Bar's investigation. This lack of cooperation, constituting an independent violation under the ABA Standards, merits additional disciplinary action. A suspension that is a year longer than the discipline imposed on Friedman is therefore reasonable in Rice's case, particularly given the possibility of a one-year stay should Rice fulfill certain conditions.[44]

## V. CONCLUSION

For the reasons discussed above, we agree with the findings, conclusions, and recommendation on sanctions made by the Hearing Committee and adopted by the Disciplinary Board.

---

44. Rice makes much of the fact that, under the ABA Standards, "suspension should be for a period of time equal to or greater than six months, but in no event should the time period prior to application for reinstatement be more than three years." ABA Standard 2.3. Thus, he argues, "the outside sanction, short of disbarment, should be a suspension of no greater than three years." As noted, we are guided but not constrained by the ABA Standards; past cases such as *Buckalew* reflect our practice of at least contemplating the imposition of sanctions longer than three years despite the ABA Standards' guidelines. *Buckalew*, 731 P.2d at 48.