*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Disciplinary Matter Involving | ) | |
| | ) | Supreme Court No. S-15366 |
| MELINDA D. MILES, | ) | |
| | ) | ABA File No. 2010D144 |
| Respondent. | ) | |
| | ) | O P I N I O N |
| | ) | |
| | ) | No. 6975 – December 12, 2014 |

Appeal from the Alaska Bar Association Disciplinary Board.

Appearances: John M. Murtagh, Anchorage, for Respondent. Louise R. Driscoll, Assistant Bar Counsel, and Stephen J. Van Goor, Bar Counsel, Anchorage, for Alaska Bar Association.

Before: Fabe, Chief Justice, Winfree, Stowers, and Bolger, Justices. Maassen, Justice, not participating.

WINFREE, Justice.

## I.      INTRODUCTION

An attorney misappropriated a deceased client's funds — rightfully belonging to the decedent's estate — and hid this misappropriation through deception while providing legal services to the estate's personal representative. Throughout more than three years of disciplinary proceedings, the attorney maintained that the funds had been gifted to her and that she was following the decedent's wishes in deceiving the estate. The Alaska Bar Association's Disciplinary Board found that no gift had been

intended or accomplished and that, among other violations, the attorney committed the criminal act of theft, misappropriation, or wrongful conversion. The Board recommends that we disbar the attorney. After independently reviewing the record, we agree with the Board and impose the recommended sanction.

## II. FACTS AND PROCEEDINGS

Like many disciplinary matters, this case is fact-specific. We therefore outline the facts in detail.

### A. Melinda Miles And The Moren Brothers

Melinda Miles was admitted to the Alaska Bar in 1989. During the relevant time period Miles was a sole practitioner handling a variety of legal matters, including will preparation and other estate planning and probate services. In 2006 Miles became acquainted with Donald Moren, who built a fence for her as a handyman. According to Miles they became close friends and she occasionally performed legal work for him.

In May 2008, for a fee, Miles formed Progressive Diversified Services, LLC (Progressive) for Donald. Progressive's Articles of Organization list Donald as both the company's organizer and its registered agent. The next day Miles signed a notarized "Special Power of Attorney" form, prepared on her office letterhead, declaring that she, as the "registered agent" of Progressive, appointed Donald as her "attorney-in-fact to act in [her] capacity to . . . cash and sign checks, make deposits and withdrawals, close the account, and otherwise have sole signatory authority and sole authority to manage as he sees fit the Key Bank banking account for Progressive Diversified Services, LLC." The form states that the "rights, powers, and authority" given to Donald "shall remain in full force and effect as long as that referenced bank account is open." That same day two bank accounts were opened at KeyBank under Progressive's name — one business checking account with an opening deposit of $15,000, and one business savings account with an opening deposit of $100,000. The account signature cards list

Miles as the sole signer for each account, and each card was signed by Miles. On each card, between Miles's name and signature, under the word "Title," are the handwritten words "Registered Agent."

About two weeks later Donald signed paperwork removing him as Progressive's registered agent and making Miles the new registered agent. The "Special Power of Attorney" form signed earlier by Miles was received by KeyBank in July. Later Miles signed, in two places, a new signature card for Progressive's bank accounts. Next to both signatures, in handwriting, Miles is designated as Progressive's registered agent. On this signature card, Donald, as Progressive's "owner," is newly added as a second signer on the accounts.

In May 2009 Donald died unexpectedly. He had no will, and his mother, Mary, was his sole heir. Donald's brother, Patrick, had power of attorney to act on Mary's behalf. In early June Patrick contacted Miles because he learned Miles had assisted Donald in setting up Progressive, and Patrick wanted assistance being appointed personal representative of Donald's estate in Alaska.

Miles did not know Donald had died until Patrick contacted her, and she immediately began recording the time she spent reviewing Donald's file and communicating with Patrick. On June 11 she recorded time for "[b]ank research." The next day Miles went to KeyBank and wrote herself counter checks for the remaining balance in each Progressive bank account: $1,162 from the business checking account and $20,072 from the business savings account. Miles then deposited the smaller checking account balance into her law office trust account and the larger savings account balance into the account of a rental property company she owned. Over the next week Miles moved $20,000 from her rental company account to her personal account and began spending the money. Miles also changed the mailing address for Progressive's bank statements from Donald's address to her own address.

The same day Miles deposited the counter checks, she wrote to Patrick that she had "done quite a bit of checking into Donald's affairs" and "wanted . . . to memorialize what [she had] discovered thus far." Setting out a "rough inventory" of Donald's assets, Miles listed the smaller Progressive checking account balance of $1,162 and other possessions, including Donald's vehicle, boat, guns, electronics, and storage unit of unknown contents. Miles did not mention the Progressive savings account. She advised Patrick of a procedure in Alaska for handling small estates, broached the subject of billing the estate for her services, and attached an invoice.

Patrick responded with a request that Miles procure information about Donald's assets, including "[i]nformation from any banks in which Don[ald] had accounts." At the end of July Miles emailed Patrick a list of the items in Donald's storage unit. Patrick responded by email a week later:

> My primary concern at this time is to obtain all information regarding Don[ald]'s bank assets. If you are unable to obtain [information] from Key Bank or any other bank in which Don[ald] had assets . . . , I want to commence action in . . . Alaska to effect my appointment as personal representative of Don[ald]'s estate.

Miles responded by email that same day:

> A long time ago I told you about the bank account at Key Bank. There is that one account. I do not have the information in front of me as I have been in court . . . . I have confirmed that there are no accounts at First National, and Mat Valley and Denalia Alaska [sic]. This only leaves . . . Wells Fargo. . . . I can check that tomorrow . . . . I will let you know if [Donald] did not end up closing that account as he told me he planned to. It may be where he has additional funds.

About a week later an attorney working with Patrick sent Miles an email, stating: "I just wanted to touch base regarding Don[ald]'s estate. . . . Any updates

regarding other bank accounts?" A few days later Miles wrote a letter to Patrick, stating:

> [T]his is not how I usually investigate a probate. Usually, I gather all of the mail, and review all of the bookmarks from the decedent's computer. That way, we know which banks . . . to approach. This has been more of a fishing expedition . . . . I knew a little about Donald's finances but not a lot . . . .
>
> Information from any banks in which Don[ald] had accounts: I have checked all of the major banks in the Anchorage/Mat Su area. The most uncooperative was Wells Fargo. But, I have confirmed that Donald did not have an account there anymore. The only accounts at a bank I have found is KeyBank. I previously sent you that information. I have closed out that account, mainly because after I told you the amount in that account an automatic payment for his cell phone came through.[1] (Emphasis omitted.)

At some point in the next seven months, Patrick retained Alaska attorney Nelson Page to assist him with Donald's estate and obtained information from KeyBank about both Progressive accounts. In March 2010 Page contacted Miles about the two accounts, asking why the funds were withdrawn, where the funds then were located, and the basis of Miles's authority to write the checks from the accounts. A week later Miles responded:

> Not until I pulled Donald's file did I recall that I was, of course, a signatory on his two accounts. One account that he wanted to use on a daily basis, and another account, that in light of the attorney/client privilege, I will only state that he wanted to be certain that the money went to me if anything

---

[1] The cell phone charge was deducted from the Progressive checking account on the day Miles first began billing the estate — for reviewing Patrick's initial letter to her. Miles did not complete the "[b]ank research" for which she billed the estate until over a week later. Nine days after the cell phone charge cleared the Progressive checking account — the same day Miles removed all of the funds from both Progressive accounts — she informed Patrick of the checking account's balance.

happened to him. You may or may not know that that account even used my social security number, and not Donald's.

. . . .

Once I realized that I was the signatory on these accounts, I sought legal counsel from an ethical standpoint. I at no time or in any way wish to miss-handle [sic] these funds. If you think otherwise please let me know.

Page responded in May that Patrick, as the personal representative of the estate, was gathering Donald's assets and requested that Miles give Page "all property and funds from Donald Moren that are in your possession, custody, or control" for later distribution under the law.

Two weeks later Miles mailed Page a check for $1,162. In the accompanying letter, Miles wrote:

Please let me know your position on the bank account that Donald held with me as principal and with my social security number. The main reason Donald structured that account that way was to protect the money from his brothers. He also claimed that one day, we would make money in joint ventures although that never came to fruition as Donald's time here was cut short.

Two days later Page responded that the money was Donald's to begin with and had to be remitted to the estate, but Miles could submit to the estate the particulars of any claim to the money. Nearly three weeks later, in mid-June, Miles responded:

I have no intentions of violating my responsibilities as a friend nor as an attorney. . . . I am familiar with probate law . . . . Donald wanted none of his estate upon his death to pass to his brothers. Donald's intent was to set up a nonprobate transfer of any funds in that account to me, and not to his family. I was clear that I could not guarantee that outcome without a Last Will and Testament. His failure to do that additional step before his untimely death does not preclude

-6-                                                                                          6975

his wishes and intent from being followed, however. Moreover, the law on nonprobate transfers supports that outcome as well.

In late June Page responded, "It is apparent that you personally received substantial sums from a business account owned by Donald Moren. I have been operating under the impression that the funds at issue are still in your trust account. If this is not the case, please advise me immediately." Page demanded documentation regarding any bank accounts Donald owned or controlled, including information regarding any joint account and any documentation of Miles's authorization to receive the funds. Page stated, "[Y]our correspondence suggests to me that you took the money and retained it for your personal benefit . . . ." No further correspondence between Miles and Page or Patrick is in the record.

## B.     Bar Grievance And Disciplinary Proceedings

In late July 2010 Patrick filed a grievance against Miles with the Alaska Bar Association. Donald's sole heir, his mother, died in September. Miles responded, stating that Donald was "a close and personal friend" for whom she had occasionally completed minor legal work for a discounted rate, but never for free, and that when Donald died she "did not hear about it right away, because although close personal friends, [she and Donald] were not actually running around together, and he hadn't come to visit and chat in over a month." Regarding the Progressive accounts, she stated:

> In May 2008, Donald asked me to open a bank account with me as primary and him as secondary so that he could give that money to me and keep his brothers, who[m] he understood to be his beneficiaries, from obtaining it. Donald told me that he was estranged from, and did not like his brothers and did not want them to obtain or inherit his money. I told Donald that the correct format would be to make a will. He stated that he would rather just open up a bank account for our use. I say "our" because he intended me

to have access to this money, and he trusted me. At no time did I think this was unethical as Donald was a personal friend of mine and did not have any close friends or other family members that he would trust to have a joint account with. So I opened this account as primary, under my name and social security number, and Donald was placed on the account as secondary.

On at least one occasion, I asked Donald to prepare a [w]ill, but he would ask how much it cost, then refuse to carry through with it.

. . . .

There were two accounts at Key Bank, Donald's primary account, and then the account already mentioned which contained money that had been gifted to and made available to me at Donald's explicit insistence. I believe (although I am not 100% certain) that Donald's primary account was in his name as the primary signator, and that I was secondary. The second account was in my name and under my social security number, and the money in it had been gifted to and made available to me by Donald. I never solicited this gift from Donald; it was his idea to do this, and I agreed, albeit reluctantly, although I was appreciative of his generosity and kindness.

I disclosed the first bank account to Patrick immediately. I did not disclose the second account as I considered it mine, and the moneys in it to be mine. . . . I have kept [the money].

. . . [M]y belief is that Donald gave me the contents of the bank account when he expressed his intent that it was available to me to spend and that I should use it if I wanted. Thus, I have not felt it appropriate, and in fact it would contravenes [sic] Donald's fervent wishes which he expressed to me, for that money to go into his estate to be divided by his estranged family.

Miles also described Patrick to be "as difficult and menacing as Donald had previously described him" and stated that she had done only "non-lawyer-specific tasks" for Patrick, like inventorying a storage unit and collecting information on Donald's account and debts. Finally, Miles asserted that during the summer of 2009 she "made several attempts to obtain ethical guidance on these matters," by (1) speaking "in detail" with a "good friend and ethical attorney, Jill Dean," and (2) attempting to speak with a professor in Seattle, Washington, whose information was on the Alaska Bar website, but with whom she had "only played phone tag." Miles also asserted that she had not intended to violate any ethical guidelines.

In late October 2011 bar counsel filed a petition for a formal hearing before an area hearing committee. The petition alleged that Miles committed the following eight counts of misconduct, misnumbered as one through six, eight, and nine:

1) representing Patrick regarding Donald's estate despite Miles's own personal conflicting interest in Donald's assets, in violation of Alaska Rule of Professional Conduct 1.7(a)(2);

2) acquiring a pecuniary interest in her client, Donald's, Progressive bank accounts without following required client-protective procedures, in violation of Rule 1.8(a);

3) acquiring a possessory or other pecuniary interest in the Progressive savings account which was adverse to her other client, Patrick, in violation of Rule 1.8(a);

4) failing to hold the property of a client or other third persons — the Progressive savings account funds — separate from Miles's own property, when she deposited those funds into her own account, in violation of Rule 1.15(a);

5) failing to promptly notify those with an interest in the Progressive savings account funds when they came into her possession, account for those funds, and deliver them to those entitled to the funds, in violation of Rule 1.15(d);

6) failing to hold the disputed Progressive savings account funds separate from other funds until entitlement to the funds had been determined, in violation of Rule 1.15(e);

8) committing the criminal act of theft, misappropriation, or wrongful conversion, in violation of Rule 8.4(b); and

9) engaging in conduct involving dishonesty and deceit by transferring the Progressive savings account funds into her own account and failing to disclose that transfer to her client Patrick, in violation of Rule 8.4(c).

Miles admitted the allegations in counts one and six, and the Bar ultimately did not pursue counts two and nine.

In February 2012 Miles submitted an affidavit reiterating her claim that the funds were her property because Donald previously had stated his intent to gift the contents of the savings account to her. Miles also stated that Donald "possessed equal or superior knowledge about his intent and plan so [Miles] did not require him to put his understanding of his plan in writing, nor did [she] advise him to review his plan with independent counsel." Miles also explained that her "statements to Patrick [while representing him] . . . were impacted by Donald's intent that he wanted none of his estate . . . to pass to his brothers."

In April, just prior to her first disciplinary hearing before the Area Hearing Committee, Miles finally tendered to Donald's estate $20,072, the amount she had withdrawn from the Progressive savings account. This was nearly three years after she placed the money in her own account and nearly two years after the estate's initial demand for the funds. After tendering the money to the estate, Miles did not present the estate with a claim to any of it.

For reasons not relevant to our decision, the Area Hearing Committee held two hearings. We describe the relevant testimony without differentiating between those hearings.

Regarding her friendship with Donald, Miles testified that after her car had been stolen by a former romantic partner he had helped her feel safe by driving her home and going with her to her office for two to three days as her "body guard." Miles stated

that Donald also "staked out" her former partner's house for a few mornings and helped Miles find a new car. Miles stated that she "probably had a crush" on Donald and that he had offered to buy her a $600 ring, but she would not let him and instead bought it for herself. Miles stated that although she previously had indicated that she interacted with Donald approximately 15 to 20 times over the course of their friendship, there may have been additional occasions when Donald "would just stop by . . . and [she would] be too busy."

Regarding her business relationship with Donald, Miles testified that Donald was "entrepreneurial minded" and had a lot of "outlandish ideas," and that although Donald suggested they "could be in business together," she never did so because she was "leery of some of his ideas." Regarding Progressive, Miles stated that she "tried really hard to make a line between" Donald as a friend and Donald as a client, so she billed him about $250 to form the company.

Regarding the bank accounts, Miles testified that Donald had asked her: "If I set up the bank account with you, with rights of survivorship, does that mean my brothers won't get any of [the money]?" Miles stated that she had told Donald she was not sure and that she told him several times he should make a will, but he replied that he did not know who his beneficiary would be or with "flippant responses" such as, "I don't plan on having any money when I die." Miles stated that she then believed Donald had set up the savings account as a joint personal bank account with a right of survivorship in her favor.

Explaining why she had never noticed that the savings account was not, in fact, a joint personal bank account with a right of survivorship and was instead Progressive's business savings account, Miles testified:

> Donald said that he wanted to set up two accounts. One, that
> he said I should divulge to his brothers, if anything happened

-11-                                                        6975

to him; and one, that he wanted to keep from them. . . . [H]e would use one, and then the other one we would keep money in. And he also said, . . . [if] we do a business, I would have access to that money, like a seed money. Or, if I needed anything. . . . [H]e wanted to think of himself as kind of helping to take care of me.

. . . I didn't . . . go to Key Bank and open up the accounts. I sat in my office and I would be working, and Donald came in and said, "Sign." And I felt that my responsibilities, ethically, were not to be involved in anything like that. So it wasn't like I sat there and reviewed it . . . . [A] friend says, "Sign. I'm gonna set up a joint bank account with you, with rights of survivorship. Sign." So, I signed.

. . . [W]here it says, . . . "Registered agent," . . . it is handwritten later. That wasn't on there when I signed. . . .

. . . [W]hen I did that [P]ower of Attorney, . . . giving Donald the right to use the account, I thought I was the primary and he was the secondary. And, for some reason, they needed something like that. And he told me to put in there, . . . you're a registered agent of Progressive Diversified. And . . . I just thought it was him being self-important, I guess.

And, I was, like, "Okay. If that's what the bank wants, there you go. Good bye."

. . . .

. . . [With the later signature card, it was] the same thing. . . . He said something like, "The bank screwed up . . . [a]nd we need to sign again."

And, again, I felt like my responsibility, ethically, is not to be involved in that. . . . So, I'll help you, you're a dear friend. So again I sign, but, I thought it was . . . just rights of survivorship. Joint owners with rights of survivorship. I thought I was the primary, which wa[s] why I had to give him that power of attorney.

-12-                                                                                      **6975**

. . . .

I felt like, since I had to do the Power of Attorney, that was really my money. But I would never take something from Donald that he wanted.

. . . .

. . . I just felt like, as a friend, I shouldn't be . . . [looking at the account paperwork], and to stay away from the gift, I shouldn't be doing that.

When asked why she never withdrew any money from the savings account during Donald's lifetime, Miles responded:

[I]f we would have done a business deal, I would have. And I know that if I . . . [were] in financial straights, I could have . . . . [B]ut . . . [Donald] used to make a lot of money. . . . And then he was disabled. . . . [T]he time he got that hundred thousand dollars, I think he owed a lot of money . . . . He bought a brand new truck. . . . I would never just spend Donald's money. But, I think if I ever wanted it or needed it, I could have had some.

When asked why Donald wanted to gift the money to her, in particular, she testified that Donald thought they someday would do business together. Miles also thought she "was probably [Donald's] best friend at that time," though they "didn't necessarily socialize after hours" because Miles had three young children. She stated that Donald was charismatic and had many friends, but she also "felt like, in many ways, he was kinda lonely." Miles stated that she attended neither the barbeque where Donald had died nor the later celebration of Donald's life.

Miles also testified that when she started helping Patrick, she did not realize he was one of the brothers from whom Donald wanted to keep his assets, and once she realized her mistake, she tried to get everything done as quickly as she could. Miles stated that Donald said the smaller account was supposed to be revealed to Donald's

brother "because [Donald] knew he'd keep looking for money until he found something." Miles further stated: "[S]ince it was my money, I felt like I didn't need to disclose the second account. I felt that legally I didn't need to disclose the first account [either], but I would, because that's what Donald wanted." She stated that she did not tell Patrick about the second account because she was honoring Donald's wishes and felt, at the time, that she was "taking the high road." Miles also stated that Donald felt that his brothers controlled his mother, so they would get the money in the event of his death.

Jill Dean, the attorney with whom Miles had discussed her ethical qualms, also testified. Dean stated that on more than one occasion during the summer of 2009, Miles said she had a joint account with a deceased friend who had been a client and was not sure what to do about it. Based upon Dean's understanding that it was a joint account, Dean had advised Miles to "hold onto the money" because she was the surviving beneficiary and therefore had the best claim to the money.

Five character witnesses testified on Miles's behalf: a rector at her church, who had known her for about three years; her career coach, who had acted in that capacity for approximately six months; a fellow animal rescue volunteer, who had known her since 2005; a friend and fellow dog musher, who had known her since 1998; and a former client, who had known her since 2011. The career coach testified that Miles had "expressed regret [about] the whole situation," recognized the "error in judgment on her part," and was working on becoming more detail-oriented. The four remaining witnesses testified that Miles had a reputation for truthfulness.

Two of Donald's close friends, William O'Brien and Robert Madson, also testified. O'Brien stated that he first met Donald in the 1990s and that they were roommates when Donald died. He stated that he and Donald hung out and went fishing and boating together. He stated that Donald was using the Progressive money to run a business selling boats, and that all he could remember Donald saying about Miles was

that she had helped him form Progressive and he had fixed a fence for her at some point. He stated that Miles had never visited their residence, and that he believed Donald had only a professional relationship with her. He stated that he did not believe Donald had any business ventures with Miles or a close friendship with her. He added that Donald was always coming up with business ideas and trying to "enlist" O'Brien to join him. When asked whether Donald would give money to Miles, O'Brien stated, "No, I can say that I'm positive he wouldn't do that."

Madson testified that he knew Donald for 36 years. He stated that his brothers, Donald, and he all grew up in the same small town in Minnesota; they all hunted, fished, and vacationed together; and Donald's mother was Madson's seventh grade teacher. He stated that Donald joined Madson in Alaska in the 1980s, and that they hunted, fished, and hung out together. He stated that Donald had quite a few close friends, but Miles was not one of them. Madson stated that although Donald had mentioned Miles on a couple of occasions because he had "legal dealings" with her, Madson had never seen Donald socialize with her, and Madson "[did]n't even know what [Miles] look[ed] like." He described Donald as "a wheeler-dealer" when it came to business and stated that Donald was "real[ly] close" with his mother and "always talked about her, and . . . any way . . . he could help her." He stated that Donald would have wanted his money to go to his mother. Regarding Donald's relationship with Patrick, Madson stated, "[Donald] didn't talk about him much, let's just put it that way."

The Area Hearing Committee found that Miles had committed the four remaining contested counts of misconduct described in the petition: counts three, four, five, and eight. This included the specific finding that "Miles committed a criminal act of theft, misappropriation, or wrongful conversion." The Committee found "as a matter of fact and law that no gift was accomplished by Donald's purported statement of an intent to make a gift of funds to Miles." It also expressed "reasonable doubt whether

Donald had actually made statements to Miles intending to gift her money through a non-probate transfer from a joint account" and stated that Miles's claims regarding such statements were "uncorroborated and self-serving."

The Committee found "the overall evidence to be clear and convincing that by the time Miles withdrew the funds and closed the accounts, she had actual knowledge that they were business accounts . . . solely owned by Donald." It also found that "Miles's testimony that at the time she withdrew the money she believed the account was a joint personal account with right of survivorship [was] simply not credible on the record before [the Committee]." In fact, "[e]ven if Miles believed that Donald intended to open a joint personal account with her, she was immediately — and repeatedly — confronted with obvious, and unmistakable evidence that Donald had, in fact, opened only business accounts at Key Bank in the name of his solely-owned company . . . ." The Committee found "more incredulous [sic] . . . Miles's claim that after Donald's death, she continued to believe that the Key Bank savings account was a personal account, even after she 'pulled Donald's file,' " remembered that she was a signer on the two accounts, "performed 'bank research,' " obtained counter checks from both accounts, and disclosed to Patrick the existence of only one account. Ultimately, the Committee found:

> Taken as a whole, . . . the record evidence . . . [is] clear and convincing that any "mistaken impression" that Miles had about the nature of the Key Bank accounts had been dispelled by the time she withdrew the funds and closed the accounts — that after Donald's death, Miles had actual knowledge that the Key Bank accounts were business accounts in which she had no ownership interest.
>
> . . . .
>
> . . . Miles knew that the[] funds had not been conveyed to her . . . .

-16- **6975**

When evaluating the proper sanction for Miles's violations, the Committee found that Miles's misconduct resulted in "at least the potential for serious harm" because Miles had "deprived [Donald's estate] of its major asset" — over $20,000 — "for almost three years and could have permanently deprived the [e]state" of that asset but for Patrick's perseverance. Given its finding that Miles's conduct was knowing, the Committee preliminarily concluded that the appropriate sanction for her conduct was disbarment. The Committee found only one mitigating factor: cooperation with the Bar. The Committee rejected Miles's argument that "delay in the disciplinary proceedings" should be a mitigating factor, and found that the "evidence of Miles'[s] reputation for honesty [did] not mitigate the circumstances of the violations committed." Finally, the Committee found that "any mitigating factors [were] more than neutralized by the [aggravating] factors . . . [of] dishonest or selfish motive; refusal to acknowledge [the] wrongful nature of [the] conduct; substantial experience in the practice of law; and indifference to making restitution." The Committee therefore recommended that the Disciplinary Board impose on Miles the sanction of disbarment.[2]

The Board adopted the Committee's findings of fact, conclusions of law, and recommendation.[3] Miles appeals the findings that she committed the violations in

---

[2]     Area hearing committees submit written reports containing findings of fact, conclusions of law, and recommendations to the Disciplinary Board. *See* Alaska Bar R. 12(i)(4). The Board may accept those reports or adopt its own, and may impose reprimands or forward its own findings of fact, conclusions of law, and recommendations to this court for more serious discipline. *See* Alaska Bar R. 10(c)(5)-(8).

[3]     Three days before the Board held Miles's October 2013 disciplinary hearing, Miles moved to admit the results of a polygraph examination conducted just one week prior. The examiner's opinion was that:

> Miles was truthful when she stated . . . 1) Donald Moren had
> told her the Key Bank account was a joint account with right

(continued...)

counts three, four, five, and eight, and requests that we impose the lesser sanction of suspension from the practice of law for no more than three years.

## III.  STANDARD OF REVIEW

"We independently review the entire record in attorney disciplinary proceedings, though findings of fact made by the Board are entitled to great weight."[4] When the Board's findings of fact are appealed, "the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous."[5]  "[W]e ordinarily will not disturb findings of fact made upon conflicting evidence."[6]  "We apply our independent judgment to questions of law and questions concerning the appropriateness

---

[3]  (...continued)
of survivorship, 2) she failed to disclose it because she believed she owned it, and 3) she did not know until June 12, 2009[,] that the account was a business account.

The Board found that "even if the polygraph's conclusion that . . . '[Miles] did not know until June 12, 2009[ — the day she withdrew the Progressive savings account funds —] that the account was a business account' is correct, it does not undercut the findings and conclusions of the . . . Committee."  We agree with the Board.  It makes little difference if Miles did not know "until" June 12, 2009, that the account was a "business account."  What matters is whether Miles believed *on* that day — and beyond — that she was unquestionably *entitled* to the money in the account.

[4]  *In re Disciplinary Matter of Shea*, 273 P.3d 612, 619 (Alaska 2012) (internal quotation marks omitted); *cf.* Alaska Bar R. 22(r) ("The Court will review findings of fact, conclusions of law, and recommendations of discipline made by the Board . . . .").

[5]  *In re Disciplinary Matter of Rice*, 260 P.3d 1020, 1027 (Alaska 2011) (internal quotation marks omitted).

[6]  *Id.* (alteration omitted) (internal quotation marks omitted).

-18-                                                        6975

of sanctions."[7]

## IV. DISCUSSION

### A. Counts Five And Eight

Miles's challenge to the Board's ultimate finding that she committed the violations in counts five[8] and eight[9] is premised upon her argument that we should overturn at least one of the following underlying factual findings: (1) no gift of the funds in the Progressive savings account was intended or accomplished from Donald to Miles,[10] and (2) at the time Miles withdrew the funds from the account, she knew she had no ownership interest in them.

---

[7] *In re Shea*, 273 P.3d at 619 (internal quotation marks omitted); *see also* Alaska Bar R. 22(r) ("The Court will decide . . . the type of discipline to be imposed . . . .").

[8] Count five alleged that Miles failed to promptly notify those with an interest in the Progressive savings account funds when they came into her possession, account for those funds, and deliver them to those entitled to the funds, in violation of Alaska R. Prof. Conduct 1.15(d).

[9] Count eight alleged that Miles committed the criminal act of theft, misappropriation, or wrongful conversion, in violation of Alaska R. Prof. Conduct 8.4(b).

[10] The Area Hearing Committee found "as a matter of fact and law that no gift was accomplished by Donald's purported statement of an intent to make a gift of funds to Miles." It also expressed "reasonable doubt whether Donald had actually made statements to Miles intending to gift her money through a non-probate transfer from a joint account" and stated that Miles's claims regarding such statements were "uncorroborated and self-serving." The Committee added that "Donald never opened a joint account with Miles" and that "two of [Donald's] close friends testified that Miles was not [Donald's] close friend . . . [and] did not socialize with him, and that Donald would not have give[n] her any of his money." Based upon the Committee's reasoning, we treat its finding that no gift was accomplished as a finding of fact that Donald lacked donative intent.

To accomplish a gift, "donative intent must be clear, unmistakable, and unequivocal."[11] Miles testified that she was "most definitely" wrong in believing that the money from the savings account belonged to her. She admitted that she had no documentation "beyond the bank accounts" memorializing Donald's alleged intent to gift the funds to her, and that no aspect of the bank accounts expressly entitled her to the funds. Miles's testimony regarding Donald's alleged "donative intent" is lacking and contradicted by the evidence: Miles testified that Donald posed a hypothetical question regarding setting up a joint account with her, she answered that he should create a will, and he shrugged off that answer. According to Miles, Donald then told her — though it is unclear when or in what terms — that he was setting up a joint personal account with rights of survivorship in Miles's favor. Donald instead created business accounts with Miles as a signer under her putative authority as the business's registered agent, had Miles sign a "Power of Attorney" form giving him "sole signatory authority and sole authority to manage [those accounts] as he [saw] fit," added himself onto the accounts as a signer under his authority as the business's owner, ran a business using the accounts, and spent the majority of the money. Donald's close friends testified that Donald would not have given money to Miles. Miles has therefore failed to carry her burden of proving erroneous the Board's finding that no gift was accomplished.[12]

---

[11]    *Roberson v. Manning*, 268 P.3d 1090, 1094 (Alaska 2012).

[12]    We note that even if Donald had intended to gift the money to Miles, a gift from a client to an attorney is subject to special scrutiny. *See, e.g.*, Alaska R. Prof. Conduct 1.8(c); Commentary Alaska R. Prof. Conduct 1.8 ("[T]he doctrine of undue influence . . . treats client gifts as presumptively fraudulent. . . . If effectuation of a substantial gift requires preparing a legal instrument such as a will or conveyance the client should have the detached advice that another lawyer can provide. The sole exception to this Rule is where the client is a relative of the donee.").

Miles next argues we should find she did not possess the mental state required for the crime of theft because, even if there actually was no gift, she believed Donald had completed a gift to her and she did not know that the funds in the savings account belonged to someone else. But it stretches credulity that Miles, having been an attorney in Alaska for 20 years and offering legal services in estate planning and probate, failed to recognize a single one of the numerous signals that Donald had not, in fact, completed a gift to her. Further, Miles's own actions are inconsistent with her professed belief that a gift had been completed: On the day the accounts were opened in her name, she prepared and signed the "Power of Attorney" form giving Donald "sole signatory authority and sole authority to manage [the accounts] as he [saw] fit," and she withdrew no money from the accounts during Donald's lifetime. Miles's explanation that she "would never just spend Donald's money," but that she thought she could have spent *some* if she wanted or needed to do so, conflicts with her argument that she believed a gift to her had been completed and that it was her money. Miles's assertion that she believed both accounts belonged to her also conflicts with her decisions to reveal one and hide the other and to never present the estate with a claim of right to the money in either account. Miles has therefore failed to carry her burden of proving erroneous the Board's finding that Miles knew the money did not belong to her when she wrongfully converted it to her possession.

## B.     Counts Three and Four

Given the egregiousness of count eight and our ultimate conclusion that disbarment is the appropriate sanction in this case, we do not need to consider Miles's arguments regarding counts three and four.

## C.     Sanctions

"Our individual examination of [the appropriate sanction in] each case is guided but not constrained by the American Bar Association's Standards for Imposing

Lawyer Sanctions[,] . . . the sanctions imposed in comparable disciplinary proceedings," and the Board's sanction recommendation in this case.[13]

"We apply a three-step analysis to determine attorney sanctions."[14] First, we examine: (1) the duty or duties violated; (2) the attorney's mental state regarding these violations; and (3) the "extent of the actual or potential injury" involved.[15] Second, for the misconduct examined in the first step, we determine what sanctions the American Bar Association's Standards for Imposing Lawyer Sanctions recommend.[16] Finally, we determine "how aggravating or mitigating factors affect the recommended sanctions," if at all.[17]

Miles admitted to representing one client regarding a former client's estate despite her own personal conflicting interest in the former client's assets and to failing to hold more than $20,000 in disputed funds separate from other monies until entitlement to the funds had been determined. Miles also failed to promptly notify those with an interest in the funds when they came into her possession, failed to account for the funds, and failed to deliver the funds to those entitled to them. Most egregiously, Miles

---

[13] *In re Disciplinary Matter of Shea*, 273 P.3d 612, 619, 623 (Alaska 2012) (internal quotation marks omitted); *cf.* Alaska Bar R. 16(a) ("A finding of misconduct by the Court or Board will be grounds for (1) disbarment by the Court; or (2) suspension by the Court for a period not to exceed five years; or (3) probation imposed by the Court; or (4) public censure by the Court . . . .").

[14] *In re Shea*, 273 P.3d at 622.

[15] *See id.*

[16] *Id.*

[17] *See id.* (internal quotation marks omitted).

committed the criminal act of theft, misappropriation, or wrongful conversion.[18]

In committing the criminal act of theft, misappropriation, or wrongful conversion, Miles's mental state was knowing.[19] We agree with the Board that the potential injury was great. Miles could have permanently deprived Donald's estate of over $20,000 and withheld the money for almost three years, during which time Donald's sole heir died. Additionally, Miles used her position to attempt to blind her current client — the estate's personal representative — to her theft of one of the estate's major assets. Such a duplicitous act by a member of the Bar, particularly while acting in her capacity as an attorney, damages the reputation of the legal profession and the legal system at large.

The American Bar Association's Standards for Imposing Lawyer Sanctions state: "Disbarment is generally appropriate when . . . a lawyer engages in serious criminal conduct a necessary element of which includes . . . misappropriation[] or theft . . . ."[20] We agree with the Board that only one mitigating factor applies in this case: cooperative attitude toward the disciplinary proceedings.[21] This mitigating factor is entirely neutralized by the five aggravating factors which clearly apply: dishonest or selfish motive, refusal to acknowledge the wrongful nature of the conduct, substantial

---

[18] Because we do not consider Miles's arguments regarding counts three and four, we do not consider those counts in our sanctions analysis.

[19] *See* AS 11.46.100(1) ("A person commits theft if with intent to deprive another of property or to appropriate property of another to oneself or a third person, the person obtains the property of another . . . .").

[20] AM. BAR ASS'N, STANDARDS FOR IMPOSING LAWYER SANCTIONS § 5.11(a) (1992). Given that this is the highest level sanction possible, we do not need to review the recommended sanctions for Miles's other misconduct.

[21] *See id.* § 9.32 (listing mitigating factors).

experience in the practice of law, indifference to making restitution, and illegal conduct.[22] Given the egregiousness of Miles's conduct and the aggravating factors involved, we agree with the Board that disbarment is appropriate in this case.

## V.    CONCLUSION

Melinda D. Miles is DISBARRED effective 30 days from today.  Miles is directed that effective today:  (1) her court filings shall be limited to notices of her impending disbarment and either withdrawals or substitutions of counsel; (2) she shall not take any new client matters; (3) she shall take immediate action to close or transfer to another attorney her open client matters; and (4) she shall cooperate with the Alaska Bar Association to ensure that her open client matters are closed or transferred by her disbarment date, including making full disclosure to Bar Counsel of the status of her client files.  The filing of a petition for rehearing shall not affect the disbarment date, although the court will consider any such petition on an expedited basis.  In the event Miles files a petition for rehearing, the Alaska Bar Association shall respond within five days of service of the petition.

---

[22]    *See id.* § 9.22 (listing aggravating factors).