In the DISCIPLINARY MATTER INVOLVING Loren K. STANTON, Attorney.

Supreme Court No. S–16209

Supreme Court of Alaska.

April 15, 2016

Before: Fabe, Winfree, Maassen, and Bolger, Justices.

### Order

Bar Counsel for the Alaska Bar Association and attorney Loren K. Stanton entered into a stipulation for discipline by consent that would result in Stanton's three-year suspension from the practice of law in Alaska. The Bar Association's Disciplinary Board approved the stipulation and now recommends that we do so, as well, and so suspend Stanton. The facts of Stanton's misconduct are set forth in the stipulation, which is attached as an appendix.[1] We take these facts as true,[2] and we apply our independent judgment to the sanction's appropriateness.[3]

Based on the uncontested facts we agree with the legal analysis—set out in the stipulation—that a three-year suspension is an appropriate sanction for Stanton's misconduct. Accordingly:

Loren K. Stanton is SUSPENDED from the practice of law in Alaska for a period of three years, effective August 2, 2015. Reinstatement proceedings would be governed by Alaska Bar Rule 29(c), and as a condition of any future reinstatement, Stanton must pay $1,000 to the Alaska Bar Association for disciplinary expenses incurred in this matter.

Entered by direction of the court.

Stowers, Chief Justice, not participating.

1. The stipulation has been edited to delete identifying references to others and to conform to supreme court technical requirements.

2. Cf. In re Miles, 339 P.3d 1009, 1018 (Alaska 2014) (stating we independently review entire disciplinary proceeding record while affording great weight to Disciplinary Board's findings of fact).

3. Id.

Attachment

## BEFORE THE ALASKA BAR ASSOCIATION

### DISCIPLINARY BOARD

In The Disciplinary Matter Involving Loren K. Stanton, Respondent.

ABA Membership No. 9505027

ABA File No. 2014D053

## STIPULATION FOR DISCIPLINE BY CONSENT PURSUANT TO ALASKA BAR RULE 22(h)

Pursuant to Alaska Bar Rule 22(h), Loren Stanton, Respondent, and Louise R. Driscoll, Assistant Bar Counsel, stipulate as follows:

### JURISDICTION AND VENUE

1. Stanton is, and was at all times pertinent, an attorney at law admitted to practice by the Supreme Court of Alaska, and a member of the Alaska Bar Association. At all times relevant, Stanton practiced law in Ketchikan, First Judicial District, Alaska.

2. Stanton is, and was at all times pertinent, subject to the Alaska Rules of Professional Conduct (ARPCs) and to Part II, Rules of Disciplinary Enforcement, Alaska Bar Rules, giving the Alaska Supreme Court and the Disciplinary Board of the Bar jurisdiction to resolve this matter.

3. Stanton began winding down his law practice in 2014. His primary responsibility as an attorney was administering the closing of the practice of an attorney who had died. Stanton officially retired on August 2, 2015, and has not paid bar dues for 2016. Upon his administrative suspension for failure to pay 2016 bar dues he will become an inactive member of the Alaska Bar Association.

### BACKGROUND FACTS

4. This disciplinary matter involves a breach of Stanton's ethical obligation to avoid a sexual relationship with his client, Carrie.[1]

5. In early January, 2014, 23–year–old Carrie was taken to the hospital where she remained for several days.

6. Carrie's mother, Tina, and her stepfather, Tom, filed a petition for custody of Jade, Carrie's two and a half-year-old daughter. Tina alleged that Carrie used marijuana heavily and had been homeless. Tina alleged that Carrie was unable and unwilling to provide for Jade's basic childhood needs. She alleged that Jade witnessed abusive behavior between Carrie and her boyfriend.

7. Tina requested full legal and physical custody of Jade. She alleged that Jade looked to her grandparents for support, nurturing, and care. They already had custody of Jade every weekend as well as other visits. They claimed they were Jade's psychological parents.

8. When Tina filed the petition, Jade was staying with a friend of Carrie's. The friend claimed that Carrie gave her custody by text message when Carrie was hospitalized.

9. Tina, through her counsel, filed a verified motion for an interim custody hearing. To support her contention that Carrie was unable to care for Jade, she alleged that the Alaska Office of Children's Services had an open file on Jade and Carrie; Jade was exposed to marijuana smoke; Carrie had an untreated disorder; and Carrie had continuing contact with an abusive boyfriend.

10. Judge William Carey set an interim custody hearing.

11. The Ketchikan women's shelter, Women in Safe Homes, asked Stanton to represent Carrie pro bono. At the interim custody hearing, Stanton requested a two-week continuance because he had just received notice about the representation and had inadequate time to prepare. After discussion, the court proceeded over Stanton's objection.

12. Witnesses testified, including several who said that Carrie's apartment was garbage-filled and filthy. Carrie testified about her recent hospitalization. She testified she

---

1. Pseudonyms have been used to protect the privacy of Stanton's client, the client's mother, and the client's daughter.

was in counseling and she wanted to protect Jade.

13. The court appointed a custody investigator and set another interim custody hearing.

14. At the next hearing, Carrie's brother testified that he had not witnessed the childhood abuse Carrie claimed to experience. After several witnesses testified, the court awarded interim custody to Carrie with visitation to Jade's grandparents. The court asked the parties to propose a visitation schedule that would control until trial.

15. Carrie filed a proposal for more frequent, but shorter visits between Jade and her grandmother to allow Carrie to take weekly parenting classes and to pursue work opportunities.

16. Around this time Carrie allegedly discussed with Stanton her concern about the affordability of an apartment in Ketchikan and the potential adverse impact of an eviction on her custody case. Carrie alleged that she was about $1,100 behind in rent. She allegedly talked about having friends who made money at prostitution. Stanton told her that he had never heard of any prostitutes in Ketchikan. He suggested that she work as a substitute teacher and discussed her job at a local shop. He had no other ideas and had very little money on him. She did not ask him for money.

17. Inappropriate texts between Carrie and Stanton started around this time. Complainant attached screen shots of texts sent during this time. The texts display lewd content and nude photos. The parties to this stipulation agree that all text messages were not turned over and that bar counsel did not seek the complete exchange of texts between Stanton and his client. By entering into this stipulation, the parties intend to keep the texts and photos confidential.[2]

18. Stanton looked at intimate pictures that his client sent him. He sent by text a picture of his genitalia to his client. Carrie and Stanton texted about masturbation and characteristics of Stanton's genitalia. Stanton expressed admiration of Carrie's breasts, and planned a Saturday rendezvous at Carrie's apartment. Stanton had given his client $100 and suggested she buy some lingerie—something that was 90 percent satin with lace and frills. He texted, "Just be yourself. Laughing sexy...."

19. On Saturday Stanton went to Carrie's apartment. There was disagreement about what happened while he was there. Carrie alleged that they had sex and Stanton reneged on his agreement to pay her so that she could pay her monthly rent. Instead of money he gave her some lollipops and a teddy bear.

20. Stanton denied that they had sex. Stanton said that he was tempted and entrapped by Carrie's sending him nude photos of herself. He went to her apartment without the protection that Carrie asked him to bring because he knew that he was not going to have sex with her due to confidential health issues and a bad cold. In a response to bar counsel he wrote: "I was not going to have sex with a drug user.... I was not going to risk getting some abhorrent disease from— my client. I was not going to have sex with a client." He agreed that he gave her a teddy bear which he intended to be a gift for Jade.

21. Months later Carrie told the Bar's investigator that Stanton and Carrie did not have sex. She said that when they met at her apartment they were clothed. She wore a red thong and red nightie and they had some inappropriate physical contact. She stated that due to the age difference between them, she would not engage in a relationship with Stanton unless she was paid.

22. Carrie told her mother that she and Stanton had sex, purportedly to show she needed her mother, to accomplish a reconciliation with her mother, and to resolve the custody dispute.

---

**2.** The parties agree that the texts will not be an exhibit to this stipulation or part of the public record unless the court orders. The Disciplinary Board may request access to the materials during its consideration of this matter or if one of the parties to this stipulation requests the Board to review the materials. If formal proceedings are initiated, the parties agree to request the texts and photos be treated confidentially under Appellate Rule 512.5.

23. After the encounter at her apartment, Carrie called Stanton to ask him to withdraw as her attorney because she and her mother had reached an agreement. He apologized for his "flirting in texts, complimenting her sensual photos she sent, sending her photos of my penis. I was embarrassed about the texting/sexting." He filed a motion to withdraw as counsel, stating his client wanted to represent herself at the final custody hearing.

24. Tina filed with the court an exhibit consisting of text messages and photos exchanged between Carrie and Stanton as evidence of the inappropriate attorney-client interaction. Because her daughter "was placed in a vulnerable position," Tina requested the court to appoint her daughter an attorney at public expense, "to help her with the case and undo damage caused by the events as recorded in Sealed Exhibit 1." Carrie did not oppose the motion to seal, agreeing that "sensitive and scandalous matters" occurred in the case.

25. Tina filed an emergency motion for a warrant to take physical custody of Jade, stating that Carrie had boarded a ferry to Washington with Jade without the grandparents' permission. Removing the child from Alaska without notarized consent of the grandparents or without a court order violated the standing order routinely entered in domestic relations cases and entered in this matter.

26. The court granted Stanton's request to withdraw.

27. The court issued an order for a hearing based on Carrie's "having left the state in contradiction of the Standing Order in this case, together with concerns in general about the defendant's living, work and other circumstances in Washington and certain other circumstances alleged in a sealed pleading filed in this matter." The court had "serious concerns about [Carrie's] judgment based on earlier testimony in this case and the rather startling and entirely unseemly events that are set out in the sealed documents in this file."

28. At the interim custody hearing, the court determined that Jade's welfare required that the grandparents have full physical and legal custody of Jade. The court allowed Carrie supervised and telephonic visitation with Jade until further court order. The court declined to appoint counsel for Carrie.

29. Carrie refused to comply with the court's order to turn Jade over to her grandparents. After she failed to appear at a show cause hearing, the court held her in contempt. The court found that her behavior met the statutory elements of felony custodial interference and issued a felony warrant for her arrest and prosecution.

30. Carrie turned Jade over to her grandmother. The court withdrew the custody warrant.

31. At the conclusion of the custody trial the court awarded custody of Jade to her grandmother. Tina told the Bar's investigator that Carrie calls Jade almost daily. If Carrie shows that she is drug and alcohol free for a six month period, the court may allow unsupervised visitation.

## DISCIPLINARY VIOLATIONS

32. Alaska Rule of Professional Conduct 1.8 sets out specific conflicts of interest that a lawyer may have with a current client. Rule 1.8(j) states:

A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced and the sexual relationship does not create a conflict under Rule 1.7(a)(2).

33. "Sexual relationship" is not defined under the professional conduct rules. The parties agree that the sexting and physical contact discussed in the above paragraphs was a sexual relationship that Rule 1.8(j) prohibits.

34. Conflict of Interest Rule 1.7(a)(2) prohibits a lawyer from representing a client if there is a significant risk that representation of the client will be materially limited by the lawyer's personal interest. Stanton's pursuit of sexual gratification—either by initiating or answering the sexual overtures with genital photos and sexually provocative texts—ad-

vanced his personal interests to the detriment of his client.

35. Alaska Ethics Opinion 88–1 addresses the potential impropriety of a sexual relationship with a client during the attorney-client relationship. Opinion 88–1 outlines circumstances when such a relationship would be considered improper. The parties agree that:

(a) Carrie was seeking legal help regarding the potential loss of her child in a custody dispute;

(b) Carrie was unduly dependent on Stanton who was representing her pro bono. Her financial status deprived Carrie of the ability to exercise free choice of counsel;

(c) Carrie was in an emotionally fragile condition, and the sexual relationship had an adverse effect on her emotional stability;

(d) The sexual relationship was prejudicial to Carrie's case. The judge remarked on her lack of judgment; and

(e) The sexual relationship had an adverse effect on Stanton's ability to protect his client's interests. The fear of embarrassing disclosures led him to put his personal interests ahead of the interests of his client.

36. Alaska Ethics Opinion 92-6 depicts the risks of a sexual relationship between a lawyer and client. A sexual relationship is presumed to be harmful to a client in any case that can be objectively viewed as emotionally traumatic, such as child custody where the loss or potential loss of a child is an issue. In a child custody matter, a parent's conduct is closely scrutinized and the details of the intimate relationship may become part of the scrutiny. Facts here bear out that the court negatively viewed Carrie's conduct.

## SANCTION ANALYSIS

37. The American Bar Association Standards for Imposing Lawyer Sanctions (1986) ("ABA Standards"), adopted in *In re Buckalew*, 731 P.2d 48 (Alaska 1986), and reported decisions of the Alaska Supreme Court, govern the sanctions for respondent's misconduct.

38. Under ABA Standard 3.0, the following factors are to be considered in imposing sanctions after a finding of lawyer misconduct:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the actual or potential injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

39. These factors are addressed in a three part methodology: 1) determine the first three factors; 2) determine recommended sanction; and 3) determine whether aggravating or mitigating circumstances exist. *In Re Schuler*, 818 P.2d 138, 140 (Alaska 1991).

## Part 1: Duty Violated; Lawyer's Mental State; Actual or Potential Injury

### A. Duty Violated

40. When Stanton violated Rules 1.7(a)(2) and 1.8(j) and Ethics Opinions 88–1 and 92–6 he breached duties he owed to his client. His sexual misconduct violated his fiduciary role and exploited his client's trust to her disadvantage.

### B. Mental State

41. Under the ABA standards:

" 'Intent' is the conscious objective or purpose to accomplish a particular result."

" 'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."

" 'Negligence' is the failure of the lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation."

42. The parties agree that Stanton did not have sexual intercourse with Carrie. Other sexual misconduct with his client occurred. The parties agree that a hearing committee could find that Stanton acted intentionally. He intentionally took and sent an inappropri-

ate photo to his client. He gave her money and texted her instructions on what to wear and how to style her hair in advance of a Saturday night encounter.

### C. Actual or Potential Injury

43. Stanton's failure to maintain an appropriate professional relationship with his client injured her. Disclosure of the sexual relationship reinforced allegations that his client was a mixed up, troubled young woman who might not be the best parent for a young child. His conflict required him to withdraw and left his client without legal counsel in a contested custody proceeding.

### Part 2: Recommended Sanction under ABA Standards

44. Absent aggravating or mitigating circumstances, ABA Standards 4.3 sets out the sanctions for failure to avoid conflicts of interest. Section 4.32 provides:

Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of the conflict, and causes injury or potential injury to a client.

### Part 3: Aggravating and Mitigating Factors

45. ABA Standards 9.0 sets out factors that may be considered in aggravation and mitigation.

(a) Factors that serve to aggravate include:

- Dishonest or selfish motive, (9.22(b));
- Vulnerability of victim, (9.22(h)); and,
- Substantial experience in the practice of law, (9.22(i)) (Stanton has practiced law in Ketchikan since 1995.)

(b) Factors that may justify a reduction in the degree of discipline to be imposed include:

- Absence of a prior disciplinary record, (9.32(a));
- Personal or emotional problems, (9.32(c));
- Character or reputation, (9.32(g)) (Stanton has a decades-long record of volunteerism in schools, church and civ-

ic organizations. He traveled to Mississippi and Texas to serve on construction crews repairing homes damaged by Hurricanes Katrina and Rita. He raised funds for children's sports, debate, Academic Decathlon, band and choir. He volunteered for the Alaska Bar Association and provided legal services pro bono for many organizations); and

- Physical or mental disability or impairment, (9.32(h) (In late 2013 and early 2014, Stanton was diagnosed with chronic, ongoing health issues that have impacted his daily life.)

### STIPULATED DISCIPLINE

46. Subject to approval by the Disciplinary Board and by the Alaska Supreme Court, Stanton and Bar Counsel agree that under Alaska Bar Rule 16(a)(2), Stanton should be suspended from the practice of law in Alaska for a period of three years. The parties agree that the effective date of this suspension will be August 2, 2015, the date Stanton closed his practice.

47. If Stanton applies to return to active practice, his reinstatement will be governed by proceedings under Alaska Bar Rule 29(c). As a condition of reinstatement, Stanton will pay $1,000 to the Alaska Bar Association for disciplinary costs and fees incurred in this case.

### CONSENT OF RESPONDENT

Respondent hereby consents, pursuant to Alaska Bar Rule 22(h), to the discipline stipulated above and states that this consent is freely and voluntarily given and is not the subject of any coercion or duress and that respondent admits to the allegations set forth above.